**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
BETTY GENE ALI,                 )
                                )
          Plaintiff,            )
                                )
     v.                         )     Civil Action No. 02-2271 (RWR)
                                )
MID-ATLANTIC SETTLEMENT         )
SERVICES, INC. <u>et</u> <u>al</u>.,          )
                                )
          Defendants.           )
_____)

<u>MEMORANDUM OPINION</u>

Plaintiff Betty Gene Ali filed this lawsuit against multiple defendants alleging that she was the victim of a scheme to defraud her of the equity in property she owned in the District of Columbia.  Defendants Richard Tolbert and Anthony Noble move for summary judgment.  While initial developments in this litigation cast the defendants' conduct in a troubling light,[1] Ali does not show the existence of a genuine issue of material fact, and the defendants are entitled to summary judgment as a matter of law.

<u>BACKGROUND</u>

Ali inherited a house located in Washington, D.C. following the death of her parents.  (<u>See</u> Defendant Anthony Noble's Statement of Material Facts ("Noble's Stmt. of Facts") ¶ 1; Pl.'s

---

[1] <u>See</u>, <u>e.g.</u>, <u>Ali v. Mid-Atlantic Settlement Services</u>, 233 F.R.D. 32 (D.D.C. 2006) (discussing willful evasion of service of process).

Resp. to Noble's Stmt. of Material Facts ("Pl.'s Resp to Noble")
¶ 1.)   Ali began trying to sell the house in 1999.  She listed
the property for $299,000, but was unsuccessful.  A realtor
suggested re-pricing the property at a price between $250,000 and
$280,000.  (Pl.'s Resp. to Tolbert's Stmt. of Undisp. Facts
("Pl.'s Resp. To Tolbert") ¶¶ 8-9.)   In early 2000, Ali obtained
a mortgage loan on the house for approximately $100,000.  (Pl.'s
Resp. to Noble ¶ 4.)   By July 2000, she owed approximately
$105,000 on her mortgage, and she was delinquent by approximately
$11,000.  Ali was facing foreclosure, and claims she was being
harassed by people in the neighborhood.  (Pl.'s Am. Compl. ("Am.
Compl.") ¶ 13; Pl.'s Resp. to Noble ¶ 7.)

        In July 2000, Ali attempted to refinance her mortgage
through a company named EZ Mortgage.  However, because Ali had
refinanced the house within the previous six months, EZ Mortgage
would not approve her second refinancing.  (Pl.'s Resp. to Noble
¶¶ 9-10.)

        While Ali was leaving EZ Mortgage's offices, she encountered
Tolbert, a junior high school classmate of hers who was an
advertising consultant for EZ Mortgage.  (Pl.'s Resp. to Noble
¶ 11; Pl.'s Resp. to Tolbert ¶ 10.)   Ali asked Tolbert whether he
could convince EZ Mortgage to approve her request to refinance
her loan.  Tolbert responded that he was not able to do that.
(Pl.'s Resp. to Noble ¶ 12.)   She called him more than once

asking if he wanted to buy the house.  (Pl.'s Resp. to Tolbert
¶ 15.)  Later, Tolbert contacted Ali and informed her that Noble
was willing to pay $150,000 to purchase the house.  (Noble's
Stmt. of Facts ¶ 15; Pl.'s Resp. to Noble ¶ 15.)  Ali alleges
that Tolbert knew that Ali "faced foreclosure and harassment
. . . and [was] aware she had limited education and knowledge of
options such as renegotiating the loan with her lender," and thus
"forced" Ali to accept Noble's $150,000 offer on the property.
(Am. Compl. ¶ 16.)

On August 3, 2000, Ali entered into a contract to sell the
property to Noble for $150,000.  On the same date, Ali also
signed an addendum to the contract binding her to pay six percent
of the sales contract price to the purchaser to be applied to
closing costs, and stating that "[b]oth parties realize property
is facing foreclosure.  Property is sold below market value to
prevent foreclosure sale."  (Pl.'s Resp. to Tolbert ¶ 17;
Tolbert's Mem. in Support of Mot. for Summ. J. ("Tolbert's Mem.")
Ex. 8 (Contract of Sale and Addendum); Noble's Mem. in Support of
Mot. for Summ. J. ("Noble's Mem.") Ex. 3 at 2.)  In return, Noble
agreed to accept the property in "as is" condition.  (Pl.'s Resp.
to Tolbert ¶ 17.)  On August 9, 2000, Noble paid $11,404.53 to
Riggs Bank, in order to bring Ali's mortgage current on her
house.  (Pl.'s Resp. to Noble ¶ 18.)

-4-

On November 21, 2000, Ali appeared at the offices of Mid-Atlantic Settlement Services ("Mid-Atlantic") to close the sale of her house.  The closing was conducted by Richard Perry, an employee of Mid-Atlantic, and Tolbert was also present.  Noble was not present, and Ali claims to have never met Noble before then.  (Pl.'s Resp. to Noble ¶¶ 23-24; Am. Compl. ¶¶ 20-23.)  At the closing, Ali signed an HUD-1 settlement sheet that identified the seller as Ali, the purchaser as Noble, and a purchase price of $150,000.  The HUD-1 also stated that Noble was paying Ali $199.22 for prepaid taxes, making a preliminary amount due to Ali of %150,199.22.  (Am. Compl. ¶¶ 23-24; Compl. Ex. B (HUD-1) at 1.)  The HUD-1 deducted from Ali's proceeds $300 for a water bill escrow, $105,725.14 for satisfaction of the existing mortgage, and $9,000 in expenses for "Sellers Paid Closing Costs."  (HUD-1 at 1.)

According to the HUD-1, after all of the deductions were taken out of the sale proceeds, Ali was entitled to receive $35,174.08.  (HUD-1 at 1-2.)  Ali signed a document titled "Agreement," in which Ali acknowledged a credit due to Noble of $29,996.42 in previously paid installment payments and a debit charged against Ali of $1,500 in pre-paid rent for Ali staying in her house through the month of December, 2000, for a total offset of $31,496.42 against Ali's proceeds at closing.  Ali was issued a check in the amount of $3,177.66.  (Am. Compl. ¶¶ 31-32; Compl.

-5-

Ex. D ("Agreement").)   The Agreement, which was signed by Ali and

notarized, reads:

> I, Betty G. Ali, hereby acknowledge that I have
> received a total sum of $29,996.42 from Anthony Noble
> for the real property located at 1010 G Street, S.E.,
> Washington, D.C.  All monies advanced through
> November 21, 2000, will be reimbursed to Mr. Noble at
> closing.  Pre pay [sic] rent in the amount of $1,500.00
> good thru [sic] January 2nd.  Grand total of
> $31,496.42.

Ali alleges that she was induced to sign the Agreement

because Tolbert told her that the difference between the

$35,174.08 due to her under the HUD-1 and the $3,177.66 paid to

her at the closing would be paid to her within three days of the

closing.[2]  (Am. Compl. ¶ 35.)   Tolbert not only denies making any

such representation (see Tolbert's Stmt. of Facts ¶ 23), but

Tolbert and Noble allege that the money Ali was paid at closing

was all she was entitled to receive in light of the offsets

mentioned above against Ali's proceeds due under the HUD-1.[3]

(Tolbert's Stmt. of Facts ¶¶ 24-25, Tolbert's Mem. at 9; Noble's

Mem. at 4-5.)[4]

---

[2] Ali does not allege that Tolbert's alleged promise induced
her to sell her house, though.

[3] Those sums fall $500 short of the $35,174.08 figure.  It is
unclear whether the $500 deposit Noble paid accounts for the
difference.  (See HUD-1, line 201.)

[4] Ali has taken inconsistent positions on this issue.  In her
amended complaint she claims to have not received any of the
$31,496.42 mentioned in the Agreement.  (See Am. Compl. ¶ 36.)
However, later she acknowledged receiving at least $27,504.53 as
partial payments from Noble.  (See Pl.'s Response to Noble ¶¶ 20-

-6-

The amended complaint alleges six counts against Tolbert and Noble: violations of the D.C. Consumer Protection Procedures Act ("DCCPPA"), D.C. Code § 28-3904, against Tolbert for brokering the sale of Ali's house (Count I); common law fraud against Tolbert (Count II); civil conspiracy to defraud Ali against Tolbert and Noble (Count III); aiding and abetting fraud against Tolbert and Noble (Count IV); negligence against Tolbert and Noble (Count VII); and equitable rescission of the agreement against Noble (Count IX).

Noble and Tolbert have moved for summary judgment.  Ali opposes, arguing that there are genuine issues of material fact that preclude summary judgment.

## DISCUSSION

"Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Moore v. Hartman, No. 08-5370, 2009 WL 1930185, at *4 (D.C. Cir. July 7, 2009) (citing Fed. R. Civ. P. 56 (c) and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)).  A genuine issue of fact is found where the evidence is "such that a reasonable jury could return a verdict for the nonmoving party," after "resolving ambiguities and drawing all factual inferences in favor of the nonmoving party."  Moore, 2009 WL 1930185 at *4 (quoting

21.)

Anderson, 477 U.S. at 255).  "The nonmoving party cannot defeat summary judgment by 'simply show[ing] that there is some metaphysical doubt as to the material facts.'"  Moore, 2009 WL 1930185 at *4 (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "Not all alleged factual disputes represent genuine issues of material fact which may only be resolved by a jury.  Material facts are those that might affect the outcome of the suit under governing law, and a genuine dispute about material facts exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Nails v. England, 311 F. Supp. 2d 116, 121 (D.D.C. 2004) (internal quotations omitted).

In deciding whether the plaintiff has shown a genuine issue of material fact, a court should accept as true statements proffered by the non-movant, other than conclusory allegations or assertions that lack factual support in the record.  Hussain v. Nicholson, 435 F.3d 359, 365 (D.C. Cir. 2006) (citing Dist. Intown Prop. L.P. v. District of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999)).  To successfully oppose a motion for summary judgment under Rule 56(c), a non-moving party must present sufficient admissible evidence for a reasonable trier of fact to find for the nonmoving party.  Juergens v. Urban Title Servs., 533 F. Supp. 2d 64, 73 (D.D.C. 2008) (citing Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).  Briefs containing

-8-

mere allegations or merely denying the movant's pleading are not
enough to prevent summary judgment; instead, a non-movant must go
beyond the pleadings to proffer specific facts rebutting the
movant's assertions.  See Greer v. Paulson, 505 F.3d 1306, 1315
(D.C. Cir. 2007); Burke v. Gould, 286 F.3d 513, 517-18 (D.C. Cir.
2002).  "Although the burden on the nonmoving party is not great,
it is still required to show specific facts, as opposed to
general allegations, that present a genuine issue worthy of
trial."  Palestine Info. Office v. Shultz, 853 F.2d 932, 944
(D.C. Cir. 1988).

I.  CONSUMER PROTECTION PROCEDURES ACT CLAIM AGAINST TOLBERT

    The amended complaint asserts that Tolbert violated the
DCCPPA by having Ali "agree to sell 1010 G Street on
unconscionable terms . . . with full knowledge of [Ali's]
inability to negotiate a fair price for the sale of her
property," contrary to DCCPPA, D.C. Code § 28-3904(r), which
reads, in relevant part:

> It shall be a violation of this chapter, whether or not
> any consumer is in fact misled, deceived or damaged
> thereby, for any person to
>
> * * *
>
> (r) make or enforce unconscionable terms or provisions
> of sales or leases; in applying this subsection,
> consideration shall be given to the following, and
> other factors:
>
> * * *

-9-

(2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;

(3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees;

* * *

(5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors[.]

D.C. Code § 28-3904(r).  The amended complaint alleges that Tolbert violated the DCCPPA through the "act of brokering the sale of 101 G Street from [Ali] to [Noble]," which Ali alleges constituted a trade practice by a merchant that is regulated by the DCCPPA.  (Am. Compl. ¶ 44.)

Tolbert asserts that he was not a commercial participant in the sale of Ali's house, which makes the DCCPPA not applicable to his actions.  "The Consumer Protection Procedures Act is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers." Snowden v. Dist. of Columbia, 949 A.2d 590, 598 (D.C. 2008) (quoting Atwater v. Dist. of Columbia Department of Consumer & Regulatory Affairs, 566 A.2d 462, 465 (D.C. 1989)).  The DCCPPA creates a cause of action for consumers to attempt to redress

unlawful trade practices.  <u>Id.</u>  Under D.C. Code § 28-3905 (k)(1),

"a person, whether acting for the interests of itself, its

members or the general public, may bring an action under this

chapter . . . seeking relief from the use by any person of a

<u>trade practice</u> in violation of a law of the District of Columbia"

(emphasis added).  Courts have held that the DCCPPA "was designed

to police trade practices arising only out of consumer-merchant

relationships."  <u>Howard v. Riggs Nat'l Bank</u>, 432 A.2d 701, 709

(D.C. 1981); <u>see also</u> <u>DeBerry v. First Gov't Mortgage & Investors</u>

<u>Corp.</u>, 743 A.2d 699, 701 (D.C. 1999) (determining that an

unlawful trade practice can be committed only by a "merchant");

<u>Snowden</u>, 949 A.2d at 599-600 (holding that the DCCPPA did not

apply because the District of Columbia was not a "merchant" with

respect to towing and storage services in part because it did not

"receive any remuneration . . . for the towing and storage

services provided[.]"); <u>Kopff v. Battaglia</u>, 425 F. Supp. 2d 76,

93 (D.D.C. 2006) (holding that plaintiff consumers could not

bring a claim under the DCCPPA based upon the defendant's

purported facilitation of unwanted facsimile transmissions

because there was no consumer-merchant relationship, and

therefore defendant's actions were not actionable trade practices

under the DCCPPA).

     Tolbert argues that because he did not receive payment for

his role in the contract of sale, he was not a broker and thus

did not make or enforce any of the purportedly unconscionable
terms in the contract, and that his behavior fell outside of the
purview of the DCCPPA because it was not a trade practice.  Ali
attempts to show that there is a genuine issue of material fact
as to whether Tolbert was compensated for some form of trade
practice with respect to the sale of Ali's house by alleging that
Tolbert acquired an equitable interest in Ali's house by paying
the outstanding balance of Ali's mortgage.  (Pl.'s Resp. to
Tolbert's Mot. for Summ. J. at 10-11.)  However, Tolbert merely
acknowledged forwarding monies provided to him by Noble to make
that payment, and Ali provides no evidence that Tolbert obtained
or materially benefitted from or took any steps to memorialize or
protect any purported equitable interest in the property.
Moreover, Tolbert had told Ali that he was going to "buy [Ali's
house] for [his] son," and there is no evidence supporting Ali's
argument (see Pl.'s Resp. to Tolbert's Mot. for Summ. J. at 8,
11-13) that Tolbert held himself out as a mortgage broker or
credit protection merchant.  (See Tolbert's Mem. Ex. 2 ("Ali
Dep.") at 110-11; Pl.'s Response to Tolbert ¶ 23 (Ali's admission
that "Tolbert made no representations and provided no
instructions of any kind to Ali at the November 11, 2000
settlement regarding any aspect of that closing.").)  Ali's
argument lacks evidentiary support in the record, and the
pleadings and the evidence demonstrate there is no genuine issue

-12-

of material fact as to whether Tolbert was a merchant under the DCCPPA.  Because Tolbert was not a merchant, his actions regarding the sale of Ali's house were not regulated by the DCCPPA, and judgment will be entered for Tolbert on Count I.[5]

II.   COMMON LAW FRAUD AGAINST TOLBERT

Count II asserts that Tolbert "knowingly misrepresented to [Ali] that she would be paid the Unpaid Funds within three days after the Closing, to induce her to sign the Fraudulent Acknowledgment.  [Ali] signed the Fraudulent Acknowledgment in reliance on [Tolbert's] misrepresentations."  (Am. Compl. ¶¶ 51-53.)  The essential elements of common law fraud in the District of Columbia are: "(1) a false representation, (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation."  Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1074 n.22 (D.C. 2008) (quoting Bennett v. Kiggins, 377 A.2d 57, 59-60 (D.C. 1977)).  "In order to state a claim for common law fraud, the plaintiff must allege that the fraud caused [her] damage."  Naartex Consulting Corp. v. Watt, 722 F.2d 779, 793 (D.C. Cir. 1983).  "It is elementary that

---

[5] Tolbert also argued that even if his actions constituted trade practices that are regulated by the DCCPPA, Ali was not "without meaningful choice" as to whether to enter the contract of sale, an element that Ali would have to show to demonstrate that the contract was unconscionable.  This issue need not be reached.

-13-

speculative damage will not support an action for common law
fraud."  Id. at 793 n.22 (citations and internal quotation marks
omitted).  "To be entitled to a trial on the merits of a fraud
claim, a plaintiff must allege 'such facts as will reveal the
existence of all the requisite elements of fraud.  Allegations in
the form of conclusions on the part of the pleader as to the
existence of fraud are insufficient.'"  Hercules & Co. v. Shama
Rest. Corp., 613 A.2d 916, 923 (D.C. 1992) (quoting Bennett, 377
A.2d at 59-60).

     Ali's fraud claim is fatally flawed as she has failed to
present evidence that Tolbert made a false representation that
Ali relied upon to her detriment.  Tolbert insists he made Ali no
promise at the closing of future payment.  Ali now admits as
much.  (See Pl.'s Resp. to Tolbert ¶ 23.)  With no
misrepresentation, there is no fraud.  Nor has Ali shown the
damage she alleged.  The amended complaint alleges that contrary
to the Agreement's representation that Ali received $29,996.42
from Tolbert before the closing, Ali never received any funds
prior to closing from Noble.  (Am. Compl. ¶ 33.)  The undisputed
fact is that the amended complaint is flat wrong, and that Ali
did receive a substantial amount of money from Noble before the
closing.  Ali admits it.  (See Pl.'s Resp. to Tolbert's Mot. for
Summ. J., ¶¶ 3-4; Pl.'s Response to Noble's Stmt. of Mat. Facts,
¶¶ 20-21.)  While the parties may differ by $2,491.81 about

exactly how much Ali did receive, Ali neither argues nor supports
with precedent that this is material and suffices to revive the
flatly false factual allegation of fraud in the complaint that
Noble never paid Ali any money before the closing.  Ali has not
brought a contract claim to recover unpaid amounts; her claim is
a tort claim of a knowing and material misrepresentation upon
which plaintiff relied to her detriment, and the facts show that
claim to be wrong.[6]  In any event, a party should not be allowed
to use her own contradictory assertions to create a genuine issue
of material fact.  See Pyramid Secur., Ltd. v. IB Resolution,
Inc., 924 F.2d 1114, 1123 (D.C. Cir. 1991); Galvin v. Eli Lilly &
Co., 488 F.3d 1026, 1030 (D.C. Cir. 2007).

Ali also argues that there is a genuine issue of material
fact as to whether Tolbert committed fraud by failing to disclose
in writing that he was not acting as an agent of EZ Mortgage and
that his actions were not in Ali's best interest.  Nondisclosure
of a material fact, or silence, as well as active
misrepresentation, may constitute fraud.  Bennett, 377 A.2d at
59.  "The concealment of a fact that should have been disclosed
is also a misrepresentation."  Sage v. Broad. Publ'n Inc., 997 F.

---

[6] Moreover, Ali has not even established what damages, if
any, she would be entitled to based upon the now-disproven false
promise by Tolbert.  For example, Ali does not point to any
evidence showing that absent Tolbert's purported representation
regarding the alleged $2,491.81 in unpaid funds, she would not
have sold her house, as opposed to not having signed the
Agreement.

Supp. 49, 52 (D.D.C. 1998).  However, "mere silence does not constitute fraud unless there is a duty to speak."  Kapiloff v. Abington Plaza Corp., 59 A.2d 516, 517 (D.C. 1948).  A duty to speak can arise either from a fiduciary relationship, see Hogan v. Md. State Dental Ass'n, 843 A.2d 902, 908 (Md. 2004), or from an instance where a material fact or defect is unobservable or undiscoverable by "an ordinarily prudent person upon reasonable inspection."  Loughlin v. United States, 230 F. Supp. 2d 26, 50 (D.D.C. 2002).

Ali fails to show that Tolbert's failure to assert in writing that he was not acting on behalf of EZ Mortgage and that his actions were not in Ali's best interests caused her any damage.  Nor does Ali present any authority supporting the notion that Tolbert was required to inform her that he was not acting as an agent of EZ mortgage in writing.  Thus, summary judgment will be granted to Tolbert on Count II.

III. CIVIL CONSPIRACY TO DEFRAUD; AIDING AND ABETTING

Count III asserts that Noble and Tolbert "agreed to defraud" Ali by preparing a "false" HUD-1, which "deceived [Ali] into believing she would receive the Promised Funds when in fact she was never paid that amount, and [Tolbert] falsely represented that Ms. Ali would receive the Unpaid Funds after closing."  (Am. Compl. ¶¶ 66-70.)  Count IV asserts a claim against both Tolbert

-16-

and Noble for "aiding and abetting the deception of" Ali.  (Am. Compl. ¶¶ 71-75.)

Tolbert and Noble argue that they are entitled to summary judgment on Counts III and IV because Ali failed to prove the underlying fraud alleged in Count II, and that the civil tort claims of conspiracy to commit fraud and aiding and abetting are derivative claims dependent upon some underlying tort.  In order to prove civil conspiracy, a plaintiff must show "'(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme.'"  Executive Sandwich Shoppe, Inc. v. Carr Realty Corp., 749 A.2d 724, 738 (D.C. 2000) (citing Griva v. Davison, 637 A.2d 830, 848 (D.C. 1994)); see also Brady v. Livingood, 360 F. Supp. 2d 94, 104 (D.D.C. 2004).  In the District of Columbia, "there is no recognized independent tort action for civil conspiracy . . . ."  Executive Sandwich Shoppe, Inc., 749 A.2d at 738 (citing Waldon v. Covington, 415 A.2d 1070, 1074 n. 14 (D.C. 1980)).  Rather, "it is a means for establishing vicarious liability for the underlying tort.'"  Id. (citing Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983)).  As a result, "civil conspiracy depends on performance of some underlying tortious act."  Id. (citing Halberstam, 705 F.2d at

-17-

479).  Similarly, civil liability for aiding and abetting
requires "proof of (1) a wrongful act causing an injury by a
party aided by the defendant; (2) the defendant's knowledge of
his role as part of an overall illegal or tortious activity at
the time that he provided assistance; and (3) the defendant's
knowing and substantial assistance in the principal violation."
Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91, 99 (D.D.C.
2002).

Ali must show some underlying fraud for these counts to
survive the motions for summary judgment.  Ali does not present a
genuine issue of material fact that Tolbert and Noble committed
fraud, and Ali does not specify in her amended complaint or in
her subsequent filings any other underlying act that would form
the basis of these derivative claims.  Therefore, the motions for
summary judgment on Counts III and IV of Ali's amended complaint
will be granted.

IV.  NEGLIGENCE

Count VII asserts that Noble and Tolbert owed a duty to Ali
to conduct the closing and consummate the transaction in a manner
that was reasonable and did not violate federal or state laws.
Count VII alleges that each defendant breached this duty to Ali

-18-

by "permitting violations of federal and state laws" that Ali does not identify.[7]  (Am. Compl. ¶¶ 91-96.)

"Under District of Columbia law, a plaintiff asserting a claim of negligence must establish that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached its duty; and (3) the breach was the proximate cause of (4) damages sustained by the plaintiff."  Jolevare v. Alpha Kappa Alpha Sorority, Inc., 521 F. Supp. 2d 1, 14 (D.D.C. 2007) (citing Dist. of Columbia v. Cooper, 483 A.2d 317, 321 (D.C. 1984), and Trifax Corp. v. Dist. of Columbia, 53 F. Supp. 2d 20, 29 (D.D.C. 1999)).  "The foundation of modern negligence law is the existence of a duty owed by the defendant to the plaintiff.  Negligence is a breach of duty; if there is no duty, there can be no breach, and hence no negligence."  Jolevare, 521 F. Supp. 2d at 15 (quoting N.O.L. v. Dist. of Columbia, 674 A.2d 498, 499 n.2 (D.C. 1995)).  "The existence of a legal duty being an essential element of a negligence claim under District of Columbia law, the plaintiffs 'must specify a negligent act and characterize the duty whose breach might have resulted in negligence liability."  Jolevare,

---

[7]Ali fails to analyze what law governs her negligence claim, instead stating the elements of a claim of negligence "under District of Columbia or Maryland law[.]"  (Am. Compl. ¶ 92.) Tolbert and Noble assert that District of Columbia law governs Ali's negligence claim, and Ali does not dispute that proposition in her reply briefs.  Ali may be deemed to have conceded the defendants' argument.  Jacobsen v. Oliver, 555 F. Supp. 2d 72, 77 (D.D.C. 2007) (citing CSX Transp., Inc. v. Commercial Union Ins. Co., 82 F.3d 478, 482-83 (D.C. Cir. 1996)).

521 F. Supp. 2d at 15 (quoting <u>Dist. of Columbia v. White</u>, 442 A.2d 159, 162 (D.C. 1982)).

Ali fails to establish any specific basis upon which Noble, as the purchaser of her house, or Tolbert, as an attendee at the closing, owed any duty toward her.[8]  Ali alleges that Tolbert had a fiduciary duty toward her because he was selling "credit protection," and that he breached that duty by failing to inform Ali that she "would only have $3,000 left over" after the sale of her house.  (Pl.'s Resp. to Tolbert's Mot. for Summ. J. at 15.)  However, there is nothing in the record showing that Tolbert held himself out as selling credit protection, that he conducted the closing, or that he assumed some role that would lead him to have a fiduciary duty to Ali at the closing.  In the face of the fact that Ali signed the Agreement, which spelled out how she would receive compensation for her house, Ali presents nothing more than a conclusory allegation that Tolbert owed her a duty to explain that she would only have a specific sum of money left

---

[8] In fact, Ali does not appear to oppose Noble's motion for summary judgment with respect to the negligence claim to the extent that it applies to him, because Ali completely fails to address Noble's argument for summary judgment on this claim in her opposition to Noble's motion for summary judgment.  Further, Ali's citation to authority purporting to establish that Tolbert owed her a fiduciary duty quotes language that appears nowhere in the case cited, and would not support the existence of a fiduciary duty even if the citation were proper.  (<u>See</u> Pl.'s Resp. to Tolbert's Mot. for Summ. J. at 15 (errantly citing <u>Columbia Plaza Corp. v. Security National Bank</u>, 676 F.2d 780, 789 (D.C. Cir. 1982).)

over.  A plaintiff alleging negligence may not rest on conclusory

assertions regarding the existence of the element of duty.

<u>Jolevare</u>, 521 F. Supp. 2d at 15 (finding that the plaintiffs

failed to establish that the defendant sorority breached a duty

owed to the plaintiffs where the plaintiffs made conclusory

allegations that the defendants owed them a duty to abide by

their own policies and procedures); <u>see</u> <u>also</u> <u>Trifax Corp.</u>, 53 F.

Supp. 2d at 29-30 (finding that the plaintiffs could not

demonstrate that the District of Columbia's Office of the

Inspector General owed them a duty to follow generally accepted

government audit standards).  Ali's conclusory allegations are

insufficient to establish a genuine issue of material fact, and

judgment will be entered for the defendants on Count VII.

V.   EQUITABLE RESCISSION

     Count IX asserts a claim against Noble, alleging that the

sale of Ali's house should be equitably rescinded because of

Tolbert's alleged fraudulent misrepresentation that he would pay

her the unpaid funds within three days of the closing.[9]  (Am.

Compl. ¶¶ 108-114.)

---

     [9] In addition, Ali appears to state a claim of
"unconscionability" under the common law of the District of
Columbia and D.C. Code § 28:2-302.  However, unconscionability
applies only defensively to preclude the enforcement of a
contract, not as a sword that a party may use to rescind an
unfavorable contract.  <u>See</u> <u>Johnson v. Long Beach Mortgage Trust</u>,
451 F. Supp. 2d 16, 36 (D.D.C. 2006).

-21-

Rescission is not an independent cause of action, but instead is an equitable remedy that a plaintiff who has been induced to enter in a contract by false and fraudulent misrepresentations may elect as an alternative to damages.  <u>See</u> <u>Brown v. National Permanent Fed. Sav. and Loan Ass'n</u>, 683 F.2d 444, 447 (D.C. Cir. 1982); <u>Simmons v. Brooks</u>, 66 A.2d 517, 518 (D.C. 1949).  Since summary judgment will be entered against Ali regarding her claim of fraud, summary judgment will be granted against her on Count IX.

CONCLUSION

Because Ali cannot show the existence of a genuine issue of material fact regarding her claims against Tolbert and Noble, and these defendants are entitled to judgment as a matter of law, their motions will be granted.  An appropriate order accompanies this Memorandum Opinion.

SIGNED this 17th day of July, 2009.


                              _____/s/_____
                              RICHARD W. ROBERTS
                              United States District Judge